WAYNE COUNTY v MICHIGAN STATE TAX COMMISSION

Docket No. 240911. Submitted October 21, 2003, at Lansing. Decided January 20, 2004; approved for publication March 11, 2004, at 9:00 A.M.

Wayne County, the city of Detroit, and others (the municipalities) brought a petition in the Michigan Tax Tribunal against the Michigan State Tax Commission, alleging that certain multiplier tables developed and adopted by the tax commission for purposes of assessing personal property of utilities were illegal, invalid, and unconstitutional. The municipalities challenged the methods used by the tax commission in developing the tables, which are utilized to approximate the true cash value of taxable personal property. The tables are mass appraisal tools used as guides by local assessors to value public-utility electric transmission and distribution property and gas distribution property (T&D property) for purposes of ad valorem property taxation. Consumers Energy Company, Detroit Edison Company, and Michigan Consolidated Gas Company were allowed to intervene as respondents. The Tax Tribunal held that the multiplier tables were legally sound. The municipalities appealed.

The Court of Appeals *held*:

The Tax Tribunal did not commit errors of law or adopt wrong principles, except with respect to the tribunal's conclusion that its review of the tax commission's multiplier tables was governed by Const 1963, art 6, § 28, and that the tables were to be afforded a presumption of reasonableness. The error does not require reversal because no prejudice was suffered by the municipalities in light of the Tax Tribunal's ultimate ruling in the case. The tribunal's factual findings were supported by competent, material, and substantial evidence. The municipalities failed to show that the methods used in constructing the multiplier tables are inherently violative of Michigan law.

1. The Tax Tribunal, pursuant to Const 1963, art 6, § 28, is the "final agency" for the administration of property tax laws and therefore was not limited in its review of the legality of the tables constructed by the tax commission. The Tax Tribunal did review

de novo the arguments presented in this matter and did not predicate its findings on a presumption of correctness with regard to the tables.

2. The determination of true cash value must be addressed and analyzed in an individual assessment dispute regarding particular property, and not in this matter concerning the methods used in developing the tables. The material sought by the municipalities in discovery was irrelevant to the present matter. The Tax Tribunal did not err in denying the motion to compel discovery.

3. The determination of what approach to valuation produces the most accurate true cash value is not relevant to the determination regarding the legality of the methods employed to create the tables. The municipalities failed to show that the methods employed were unlawful.

4. Regulatory effect should be considered in determining the value of T&D utility property. The tax commission did not improperly consider regulatory effect.

5. The Tax Tribunal properly ruled that the tax commission did not use a wrong principle or commit an error of law in excluding contribution in aid of construction received by the utilities in its development of the tables.

Affirmed.

*Lewis Reed & Allen, P.C.* (by *Richard D. Reed, Anne M. Fries, Patricia R. Mason,* and *Geoffrey Upshaw*), for the petitioners.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Ross H. Bishop* and *Gerald A. Whalen*, Assistant Attorneys General, for the respondent.

*Honigman Miller Schwartz and Cohn LLP* (by *Michael B. Shapiro, Steven P. Schneider,* and *Frederick M. Baker, Jr.*) for the intervening respondents.

Amici Curiae:

*Honigman Miller Schwartz and Cohn LLP* (by *Michael B. Shapiro, Steven P. Schneider,* and *Frederick M. Baker, Jr.*) for Michigan Chamber of Commerce and Detroit Regional Chamber of Commerce.

Before: SMOLENSKI, P.J., and MURPHY and WILDER, JJ.

PER CURIAM. Petitioners (hereinafter municipalities) appeal as of right from a judgment entered by the Michigan Tax Tribunal (hereinafter MTT or tribunal), which ruled that multiplier tables developed and adopted by respondent Michigan State Tax Commission (STC) for purposes of assessing personal property of utilities were legally sound. On appeal, the municipalities argue that the MTT committed a multitude of errors that require reversal. We disagree and affirm, holding that, pursuant to the Michigan Constitution of 1963, art 6, § 28, the MTT did not commit errors of law or adopt wrong principles, except with respect to the tribunal's conclusion that its review of the STC's multiplier tables was governed by Const 1963, art 6, § 28, and that the tables were to be afforded a presumption of correctness. This error, however, does not compel reversal because no prejudice was suffered by the municipalities in light of the substance of the MTT's ultimate ruling in the case and the appellate issues raised. Additionally, in entering a judgment in favor of the STC and intervening respondents (hereinafter utilities), the tribunal's factual findings were supported by competent, material, and substantial evidence. The municipalities failed to show that the multiplier tables violate Michigan law.

### I. CASE OVERVIEW

The municipalities assert that personal-property multiplier tables H & I, developed, constructed, and adopted by the STC after extensive studies, are invalid and unlawful under Michigan law. The municipalities challenge the methods used by the STC in developing the tables, which are utilized to approximate the true cash value with respect to taxable personal property. The

multiplier tables are mass appraisal tools used as guides by local assessors to value public-utility electric transmission and distribution property and gas distribution property (T&D property)[1] for purposes of ad valorem property taxation. The multiplier tables are utilized by taking the original or historical installed cost of particular T&D property by year of acquisition and applying a multiplier formulated by the STC to convert the original cost to a current value. The multiplier varies depending on the age of the property, and the product of the equation supposedly reflects an approximation of the subject property's true cash value.

The multiplier tables are contained in the STC's *Assessor's Manual.* Pursuant to MCL 211.10e, assessing officials are required to use the manual prepared by the STC "as a guide in preparing assessments." The tables are used to value T&D assets owned by the utilities such as poles, pipes, wires, transformers, and so forth. The municipalities vigorously challenge the tables on the basis that the value of the utility property is under-assessed when the tables are utilized, thereby not reflecting the true cash value of the property as required by law. The municipalities maintain that the methods used by the STC to develop the tables are unlawful and contrary to proper assessment principles as recognized in case law.[2]

---

[1] Although referenced as T&D property for purposes of this opinion, utility property in regard to gas only concerns gas distribution property, not gas transmission property. Gas transmission property is subject to the multipliers found in table J, which was not challenged. Although some T&D property is more in the nature of real property, MCL 211.8 dictates that it be treated as personal property for purposes of taxation.

[2] This action does not involve an actual assessment dispute regarding particular property, but rather involves a direct action attacking the legal validity of the tables outside the context of an assessment case.

The Michigan Constitution requires that property taxation be predicated on the true cash value of the property.

> The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law except for taxes levied for school operating purposes. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments. [Const 1963, art 9, § 3.]

MCL 211.27 provides, in pertinent part, that " 'true cash value' means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale."

Initially, the municipalities filed a complaint in the Wayne Circuit Court challenging the STC's tables, alleging that the tables were illegal, invalid, and unconstitutional. The municipalities sought a declaratory judgment to that effect (count I), along with a preliminary and permanent injunction (count II). The municipalities also sought a writ of mandamus (count III) and superintending control (count IV), arguing that the tables were not promulgated pursuant to the Administrative Procedures Act (APA), MCL 24.201 *et seq.*, despite the fact that use of the tables, through placement in the *Assessor's Manual*, was mandated. The circuit court found that it did not have subject-matter jurisdiction over counts I and II, and it transferred those counts to the MTT pursuant to MCR 2.227. With regard to counts III and IV, the circuit court granted summary disposition in favor of the STC, opining that the manual and the

tables contained therein did not constitute "rules" under the APA; therefore, the requisite procedures for rule promulgation need not have been followed. This Court upheld the trial court's ruling, stating:

> MCL 211.10e states that "[a]ll assessing officials . . . shall use only the official assessor's manual or any manual approved by the state tax commission . . . as a *guide* in preparing assessments" (emphasis added). If evidence of a different true cash value is apparent, a party may obtain a deviation from the manual. See, e.g., *Jones & Laughlin Steel Corp v City of Warren,* 193 Mich App 348, 353, 356; 483 NW2d 416 (1992). Ultimately, the true cash value of the property controls. See generally *Washtenaw County v State Tax Commission,* 422 Mich 346, 364-365; 373 NW2d 697 (1985). Accordingly, the Assessor's Manual does not constitute a binding rule of law that definitively establishes the true cash value of taxable property.
>
> . . . [T]he multiplier tables in the Assessor's Manual represent [the STC's] interpretation of true cash value, but this interpretation is not ultimately controlling. *Jones, supra* at 353-356. Indeed, MCL 211.10e itself mandates that the manual be used as a "guide" in preparing assessments. Accordingly, we agree with the trial court that the Assessor's Manual does not have the force and effect of law and does not affect the public's right to have property assessed at "true cash value." The exceptions to the definition of "rule" contained in MCL 24.207(g) and (h) apply here, and therefore no APA violation occurred. [*Wayne Co v Michigan State Tax Comm,* unpublished opinion per curiam of the Court of Appeals, issued April 2, 2002 (Docket No. 227236).]

The case proceeded to the MTT, which received witnesses and exhibits pertaining to the assessment of utility property, valuation methods, and the tables adopted by the STC. The tribunal concluded, in an eighty-page opinion:

> The record demonstrates that the STC, in adopting personal property multiplier Tables H and I, acted lawfully

in accordance with its responsibilities and authority under the general property tax act. Its judgment in this matter was informed by surveys of other states' methodologies, BDO Seidman recommendations, Staff valuation and multiplier studies, written and oral submissions by interested parties and its own investigations. It obtained, weighed, and diligently considered substantial and relevant data in exercising its judgment in adopting utility personal property multiplier Tables H and I.

## II. BACKGROUND ON DEVELOPMENT OF THE TABLES

The factual background concerning development of the tables and the basic nature of the methods used by the STC are not in dispute. In 1998, the STC contracted with the accounting firm of BDO Seidman to study the effectiveness of the personal-property multiplier tables[3] contained in the *Assessor's Manual* to determine whether they were accurate and, if not, to develop and recommend new multipliers that would result in accurate valuations. The study was initiated because the majority of the personal-property multiplier tables in the *Assessor's Manual* had indeterminate origins and were developed before 1966. The STC was concerned that the current tables no longer provided reasonable approximations of the true cash value of personal property. BDO Seidman did not develop tables for utility property valuation, stating that attempts to value utility T&D property would be subjective at best, but rather recommended that the use of "rate base" calculated for the Michigan Public Service Commission (MPSC) for ratemaking purposes was an appropriate proxy for market value and should be used to determine valuations for utility T&D personal property.

---

[3] The study included a general review of numerous personal-property multiplier tables and was not limited to utility property.

Personal property in Michigan has been valued through multiplier tables since the early 1960s. In general, taxpayers report the original (historical) installed cost of their property by year of acquisition and the STC applies a multiplier that converts the original cost to a current true cash value for the property. Until recently, the multipliers were less than one (1) and decreased as property aged. The new multipliers for T&D property are lower than the prior multipliers, and this allegedly has a billion dollar effect on total value of T&D property, along with a concomitant effect on tax revenues.

Upon receipt of BDO Seidman's report, the STC assigned to the Utility Valuation Section (UVS) of the Michigan Department of Treasury's Property Tax Division the duty of researching BDO Seidman's recommendations. The UVS reviewed BDO Seidman's report, reviewed other materials and resources, and sought information from both outside parties and BDO Seidman personnel in regard to multiplier tables. The UVS recommended rejection of BDO Seidman's proposal to use "rate base" as a surrogate for true cash value for utility T&D property.

Contemporaneous with BDO Seidman's analysis of the tables, the STC conducted a survey of other states to determine how they valued utility personal property. Upon receipt of the UVS's report, the STC asked the UVS if it could develop a value indicator and proposed multiplier tables for utility T&D property. The UVS responded affirmatively, and it was directed to develop such tables.

Concurrently, the STC solicited input from interested parties, namely, units of local government, local government officials, and individual companies, regarding utility personal-property valuations. Public meetings were held and an open offer was made to hold additional

meetings on specific issues, including the valuation of utility personal property. The "Assessors Group," a large group described as experts in valuation, assessment, and property tax issues, and among the best assessors in the state, submitted proposed multiplier tables for T&D property for the STC's consideration. The Assessors Group's proposals were endorsed by the Michigan Assessors Association, the Michigan Association of Equalization Directors, the Michigan Municipal League, and others.

To aid in preparing its report, the UVS met with individuals from the STC, the treasury's tax division, the MPSC, individuals from local governments, and representatives of the utility industry. In developing its report, the UVS valued certain tangible T&D personal property owned by two electric companies—Detroit Edison Company and Consumers Energy Company—and certain gas distribution personal property owned by two gas utilities—Consumers Energy Company and Michigan Consolidated Gas Company. The sample comprised approximately eighty-five percent of all T&D property in the state. The UVS considered all three accepted methods of valuation, cost, income, and market/sales, and ultimately relied on the cost and income approaches to determine value.[4] The UVS gave the income approach more weight than the cost approach in arriving at its total reconciled values for utility T&D property, giving approximately eighty percent weight to its income approach valuation and approximately twenty percent

[4] The cost approach used by the UVS involved taking the property's original cost, making a reduction for depreciation, and then arriving at the "net book value" of the subject property. Original cost less depreciation thus equates to net book value, and the terms are used interchangeably by the parties and in this opinion. The cost and income approaches to valuation will be discussed below in detail in relation to the specific appellate arguments.

weight to its cost approach valuation. The UVS then took the reconciled value and, considering composite cost-by-vintage-year information supplied, developed through an iterative process multipliers that, when applied against the original cost by year of acquisition, came within a reasonable range of the total value determined. The accepted range was plus or minus 1% for electric T&D property and plus or minus 1.5% for gas distribution property. There were separate formulations for electric and gas T&D property, hence the two tables.

The numerical data, such as original costs and net book values, used by the UVS and the STC in developing the multiplier tables, came from reports by AUS Consultants that had been produced for the benefit of the utilities after the utilities contracted with AUS Consultants to investigate the accuracy of the then-existing multiplier tables used by the STC. The data used reflected numbers as of December 31, 1997. The STC confirmed this numerical data through other sources.

No specific testing was done regarding the accuracy of the tables in reference to (a) individual assessing jurisdictions, (b) other utility companies, or (c) different tax year dates. Once again, the tables were adopted as mass appraisal tools, or mass appraisal guidelines, thereby providing an approximation of value for purposes of local assessment.

The STC chairman, after receiving the UVS's report, asked the UVS whether it would harm the study if the STC decided to change the weighting of the cost and income valuation approaches. The UVS believed that it was within the range of appraisal judgment to weigh the cost and income valuation approaches more evenly. The STC then revised the UVS valuation study, recalculated a new total reconciled value for gas and electric

T&D property, and proposed multiplier tables reflecting the new total values based upon a more balanced weighting of the cost and income valuation approaches. This lowered the total reconciled value, thus lowering the multipliers. These "new" tables were presented to the STC and formally adopted on November 23, 1999.

The STC's adopted tables were consistent with what the Assessors Group had requested, with the exception of lower multipliers, in that both proposals: have separate multiplier tables for electric and gas property, are based on original cost, result in the same value for a given original cost regardless of location within the state or use, contain a fifteen-year floor for administrative convenience, have multipliers all less than 1.00, and are all less than the arbitrary multipliers that had been in use for decades.

### III. PROCEEDINGS IN THE TAX TRIBUNAL

On March 28, 2000, the MTT issued a briefing order sua sponte, requiring the parties to file briefs addressing two questions: (a) the proper scope of the tribunal's review of a decision of the STC regarding the *Assessor's Manual*; and (b) whether the multiplier tables should be modified only if review clearly established that a material mistake of fact, fraud, or error of law occurred. On May 25, 2000, the MTT issued an order granting a motion for leave to intervene by the utilities whose property had been valued by the UVS in developing its report.

On June 1, 2000, the municipalities filed a motion to compel discovery and a motion for immediate consideration. In the motion to compel discovery, the municipalities alleged that they had identified fourteen local units of government that supposedly represented a cross-section of communities in Michigan. The motion requested information from both the intervening utili-

ties and nonparty utilities regarding utility personal property in the individual communities, which could then be used to develop information for purposes of comparison with the value conclusions reached through the use of the STC multiplier tables. On June 21, 2000, the MTT issued its order regarding the standard of review, stating that the multiplier tables would be accorded a presumption of correctness, and that the STC's adoption of the tables would be affirmed absent fraud, error of law, or adoption of wrong principles pursuant to Const 1963, art 6, § 28. On June 28, 2000, the tribunal entered an order denying the municipalities' motion to compel discovery. The MTT held that the information the municipalities sought was not relevant to the subject matter of the proceeding and was not likely to lead to the discovery of admissible evidence. The tribunal noted that the subject matter of the proceeding was whether the multiplier tables at issue were valid mass appraisal guidelines, and that the municipalities' prehearing statement raised no factual issues that required the use of appraisals of utility property in individual taxing jurisdictions. Instead, the MTT noted that the factual issues the municipalities raised dealt with the methods the STC used to develop the tables; thus, the information sought through discovery was irrelevant to whether the multiplier tables were valid mass appraisal guidelines.

The forty-nine-day hearing commenced on December 4, 2000, and ended on June 18, 2001. On April 5, 2002, the MTT issued its eighty-page opinion.

### IV. APPELLATE ISSUES AND ANALYSIS

#### A. STANDARDS OF REVIEW

The municipalities argue that the MTT erred as a matter of law when it ruled that its "standard of

review" with respect to the STC's adoption of the multiplier tables is the standard set forth in the Michigan Constitution 1963, art 6, § 28. The municipalities contend that the tribunal improperly accorded the tables a presumption of validity and correctness, thereby increasing their burden of proof. The municipalities further maintain that the correct standard of review is review de novo. They contend that, although under MCL 205.737(3) "[t]he petitioner has the burden of proof," a hearing de novo is much different from one in which a presumption of correctness has been awarded. We agree.

We first address our standard of review of the MTT's ruling. This Court reviews decisions from the tribunal in accordance with Const 1963, art 6, § 28. *Edward Rose Bldg Co v Independence Twp,* 436 Mich 620, 631-632; 462 NW2d 325 (1990); *Inter Coop Council v Dep't of Treasury,* 257 Mich App 219, 221; 668 NW2d 181 (2003). Const 1963, art 6, § 28 provides, in pertinent part:

> In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation.

When fraud is not alleged, appellate courts are limited in their review of MTT decisions to determining whether the tribunal made an error of law or adopted a wrong principle. *Meadowlanes Ltd Dividend Housing Ass'n v Holland,* 437 Mich 473, 482-483; 473 NW2d 636 (1991); *Antisdale v Galesburg,* 420 Mich 265, 277; 362 NW2d 632 (1984). All factual findings are final if supported by competent, material, and substantial evidence. *Meadowlanes, supra* at 482; *Inter Coop, supra* at 221. Substantial evidence is the amount of evidence

that a reasonable person would accept as being sufficient to support a conclusion; it may be substantially less than a preponderance of the evidence. *In re Payne,* 444 Mich 679, 692, 698; 514 NW2d 121 (1994); *Inter Coop, supra* at 221-222. This case also involves issues of statutory interpretation that we review de novo. *Id.* at 222.

We now turn to the proper review mechanism with respect to the MTT's review of the multiplier tables. The tribunal ruled that the municipalities had to show that the multiplier tables were adopted by the STC in accordance with Const 1963, art 6, § 28. In issuing its order, the MTT determined that the STC was the "final agency," as that language is used in art 6, § 28, for preparing and approving the *Assessor's Manual,* including development of personal property multiplier tables H and I. The STC and the utilities argue that the STC is the final agency provided for the administration of property tax laws, and that the tribunal ruled correctly. MCL 205.753(1) specifically and clearly provides to the contrary:

> Subject to section 28 of article VI of the state constitution of 1963, and pursuant to section 102 of the administrative procedures act of 1969, Act No. 306 of the Public Acts of 1969, as amended, being section 24.302 of the Michigan Compiled Laws, and in accordance with the Michigan court rules, an appeal from the tribunal's decision shall be by right to the court of appeals. *For purposes of the constitutional provision, the tribunal is the final agency for the administration of property tax laws.* [Emphasis added.]

This language reinforces the position that our review of the MTT is controlled by art 6, § 28, and negates the position that the constitutional provision was applicable to the tribunal's review of the STC's adoption of the tables.

Respondents argue that several statutes, including MCL 209.104, 211.10e, and 211.150(1), dictate that the STC is the final agency for preparing and approving the *Assessor's Manual*. A review of these statutes, and the clear language contained therein, indicates that the STC is indeed responsible for preparing the *Assessor's Manual*, and is empowered to enforce the manual; however, the statutes do not provide that the STC is the "final agency" for purposes of the manual in relation to art 6, § 28. In contrast, MCL 205.753(1) clearly and unequivocally provides that "[f]or purposes of the constitutional provision, the tribunal is the final agency for the administration of property tax laws." Respondents are unable to overcome this provision. There is no doubt that the MTT has the expertise to address complicated tax issues and is in a position to properly assess the accuracy and legitimacy of valuation methods. *Johnston v Livonia*, 177 Mich App 200, 204-205; 441 NW2d 41 (1989). Obviously, if the Legislature intended that the STC be the final agency under art 6, § 28, for purposes of the *Assessor's Manual*, the language in MCL 205.753 would not have been drafted in a manner that is all-encompassing. Regardless of whether the MTT lacks the ability and authority to construct multiplier tables itself, there is no law that supports the proposition that the tribunal is limited in its review concerning the legal validity of the tables as constructed by the STC.

Neither the MTT nor respondents cite any relevant case or statutory law providing that the STC is the "final agency" with respect to the *Assessor's Manual* or the administration of property tax laws under art 6, § 28. The cases cited in support of respondents' theory that art 6, § 28 controls are irrelevant because all those cases were decided before the adoption of the Tax Tribunal Act, MCL 205.701 *et seq.*, in 1974. See, e.g., *Davidson v City of Lansing*, 356 Mich 697, 700; 97

NW2d 592 (1959) (stating, in absence of fraud, determination of the STC is final with regard to matter of assessment of property). The Tax Tribunal Act vested the MTT with jurisdiction regarding matters previously heard by the STC as an appellate body. *Richland Twp v State Tax Comm,* 210 Mich App 328, 333; 533 NW2d 369 (1995).

The tribunal erred in relying on art 6, § 28 in regard to its review of the STC's multiplier tables. This does not, however, end the analysis because it is necessary to determine the proper nature of the MTT's review of the tables.

MCL 205.735(1) provides, in relevant part, that "[a] proceeding before the tribunal is original and independent and is considered de novo." Once again, we have all-encompassing language that clearly applies here. "If the statute's language is clear and unambiguous, then we assume that the Legislature intended its plain meaning and the statute is enforced as written." *Roberts v Mecosta Co Gen Hosp,* 466 Mich 57, 63; 642 NW2d 663 (2002) (citation omitted). There can be no reasonable disagreement with the conclusion that the municipalities' action constituted "a proceeding before the tribunal . . . ." "A conclusive presumption of validity is diametrically opposed to the concept of an original, independent, *de novo* proceeding at which the petitioner simply bears the burden of proof." *Alhi Dev Co v Orion Twp,* 110 Mich App 764, 768; 314 NW2d 479 (1981). "The Tax Tribunal Act does not adopt a presumption of validity as a standard for review." *Id.*

In light of the clear and unambiguous language contained in subsection 35(1), there is no need to address the myriad arguments presented by respon-

dents that attempt to nullify or distinguish § 35.[5] More-over, we find that the MTT's failure to properly identify the correct review mechanism does not require us to reverse its ruling because, ultimately, the tribunal did not utilize a presumption of correctness in rendering its opinion and judgment; it reviewed the arguments de novo.

The MTT ruled that the methods used by the STC to develop and construct the multiplier tables for use by assessors as mass appraisal tools did not constitute an error of law or the adoption of wrong principles. The tribunal separately and extensively addressed each of the arguments set forth by the municipalities and concluded that there was no error. Although the language used by the MTT mimicked that found in art 6, § 28, it was in fact the position and argument of the municipalities that the methods used by the STC were contrary to law and legal principles governing tax valuation of personal property. The question of preju-dice concerns whether the tribunal's ruling that there was neither error of law nor the adoption of wrong principles was affected in any way by a presumption of

---

[5] We do note that our review of these arguments indicates that they lack merit. *Almira Twp v Benzie Co Tax Allocation Bd,* 80 Mich App 755, 761-762; 265 NW2d 39 (1978), is factually distinguishable and is predi-cated on a statute, MCL 211.217, that addresses a standard of review not applicable here. Reliance on the APA provisions cited by respondents is misplaced because they pertain to judicial review of contested cases, not tribunal review of a quasi-legislative act. MCL 24.301 *et seq.* The Revised Judicature Act (RJA), and specifically MCL 600.631, does not support respondents' position because it has been interpreted as limiting review to that contained in Const 1963, art 6, § 28, which tax provision is inapplicable here, and which general review provisions concern judicial or quasi-judicial decisions only. *Attorney General v Pub Service Comm No 1,* 237 Mich App 27, 41-42; 602 NW2d 207 (1999). Adoption of the tables was not a judicial or quasi-judicial action.

correctness as opposed to a wholly independent and review de novo of the arguments.

Nowhere in its opinion did the MTT indicate that its particular finding on any given issue was controlled or affected by a presumption of correctness. In fact, the tribunal was straightforward and adamant that there was no error of law or adoption of wrong principles when addressing each issue and argument, and the MTT's position was supported by citation of applicable law and the record of its proceedings. There was no ruling, for example, stating that a particular argument presented a close call or was slightly favorable to the municipalities but that the tribunal could not rule contrary to the STC because of a presumption of correctness. It appears that the MTT's language providing for a presumption of correctness correlated more with the tribunal's position that the municipalities had the burden of proof to show that the STC's methods were unlawful. Indeed, with the municipalities having the burden of proving that the multiplier tables were unlawful, there was an inherent presumption of correctness as a necessary starting point of the litigation. However, the municipalities do not dispute that they had the burden of proof, nor is their argument couched in terms related to the burden of proof.[6] Therefore, we conclude that, although the MTT erred in relying on art 6, § 28, and in stating that the tables had a presumption of correctness, reversal is not warranted on this issue because the tribunal was requested by the municipalities to determine, in essence, whether there was an error of law or adoption of wrong principles in con-

---

[6] Our conclusion is buttressed by the municipalities' own statement in their appellate brief, wherein it is argued that "[t]he Tribunal erred as a matter of law by *increasing* the burden of proof imposed on Petitioners-Appellants." (Emphasis added.)

structing the tables, and ultimately the MTT did not render a ruling predicated on a presumption of correctness.

### B. DISCOVERY

As indicated above, the municipalities, through deposition notices, made formal requests for records with respect to fourteen assessing units, which allegedly represented a cross-section of Michigan communities.[7] The utilities and others refused to produce the records from those communities, and the MTT denied the municipalities' motion to compel discovery on the ground that the information was irrelevant.

The municipalities argue that the ultimate determination for the MTT to make was whether the use of the tables accurately produced the true cash value of T&D property. According to the municipalities, the best evidence of the accuracy of the tables could have been gleaned from the identity and vintage costs of T&D property in the fourteen assessing units. Every utility company maintains complete and detailed T&D tangible property records, which, the municipalities allege, is the only source regarding the type, age, and condition of the property, and this information can be searched through the numerous assessing jurisdictions in Michigan. The municipalities maintain that the requested records would have allowed for the testing of the accuracy of the tables.

The municipalities argue that they were entitled to discovery pursuant to Tax Tribunal Rule (TTR) 205.1260, 1999 AC, R 205.1260, and MCR 2.302(B). The municipalities further argue that the MTT effectively

---

[7] The deposition notices were served on six officers of utilities owning T&D property, including, but not limited to, the utilities involved here.

prevented them from identifying the subject property to adjust a sale for comparability or to prepare any type of appraisal of the subject T&D property. The municipalities maintain that the tribunal's ruling effectively denied them the best possible evidence available to test whether the valuation methods employed by the STC in arriving at the tables were accurate and reasonably related to the fair market value of the T&D properties subject to the study.

The information sought by the municipalities was requested through the use of deposition notices. TTR 205.1257, 1999 AC, R 205.1257, provides that "[p]arties may stipulate to take depositions or may, by written motion, request to take the testimony of any person, including a party, by deposition for the purpose of discovery or for use as evidence in the action, or for both purposes, and the tribunal, in its discretion, may order the taking of depositions." Here, it does not appear that the municipalities filed a motion before serving the deposition notices, which included the requests for the information at issue, and there was no stipulation to take depositions. Regardless, the MTT eventually and directly addressed the request in the motion to compel after the individuals, whose depositions were being sought, refused to comply with the production requests. In light of this fact, the municipalities' technical violation of TTR 205.1257 does not preclude us from addressing the substantive issue in regard to whether the MTT erred in denying the discovery requests.

TTR 205.1260(1)(a) provides that the tribunal may, upon a motion to compel discovery, "[o]rder a party to produce, and permit the inspection and copying or photographing, by or on behalf of the moving party, of any designated documents, papers, books, records, accounts, letters, photographs, objects, or tangible things

which are not privileged . . . ." We are unaware of a
TTR that specifically and substantively covers the scope
of discovery, and the parties do not cite any such rule.
We note that TTR 205.1260 refers to the "scope of
discovery" as permitted by TTR 205.1255, 1999 AC, R
205.1255, which involves interrogatories and only men-
tions in subrule 255(6) that they may be limited as
justice requires to protect the answering party from
annoyance, expense, embarrassment, oppression, or
violation of a privilege. TTR 205.1111(4), 1999 AC, R
205.1111(4), provides that the Michigan Court Rules
govern where there is no direction in the TTRs. MCR
2.302(B)(1), regarding the scope of discovery, provides:

> Parties may obtain discovery regarding any matter, not
> privileged, which is relevant to the subject matter involved
> in the pending action, whether it relates to the claim or
> defense of the party seeking discovery or to the claim or
> defense of another party, including the existence, descrip-
> tion, nature, custody, condition, and location of books,
> documents, or other tangible things and the identity and
> location of persons having knowledge of a discoverable
> matter. It is not ground for objection that the information
> sought will be inadmissible at trial if the information
> sought appears reasonably calculated to lead to the discov-
> ery of admissible evidence.

The MTT precluded discovery of the information on
utility property in the fourteen assessing jurisdictions,
ruling:

> The subject matter of this proceeding is whether multi-
> plier tables H and I are valid mass appraisal guidelines.
> Petitioners' prehearing statement raises no factual issues
> that require the use of appraisals of utility personal prop-
> erty in individual taxing jurisdictions. Instead, the factual
> issues contained in Petitioners' prehearing statement at-
> tack the STC methodology used in preparing the tables. The
> information sought by the discovery motion is irrelevant to
> the issues raised by Petitioners and is irrelevant to whether

the utility personal property multiplier tables H and I are valid and appropriate mass appraisal guidelines complying with the constitution and laws of the State of Michigan.

A trial court's decision to grant or deny discovery will not be overturned on appeal absent an abuse of discretion. *Lantz v Southfield City Clerk,* 245 Mich App 621, 629; 628 NW2d 583 (2001). An abuse of discretion standard is equally applicable with respect to discovery rulings by the MTT. See *Gillette Co v Dep't of Treasury,* 198 Mich App 303, 318-319; 497 NW2d 595 (1993); TTR 205.1257 (depositions may be ordered at the MTT's discretion).

Whether the MTT abused its discretion over discovery turns on what information is relevant to the issues in the case. Many of the arguments presented by the municipalities did not require the production of the materials requested because they were purely legal and directly attacked the methods used as being inherently in violation of Michigan law. Those same arguments are presented in this appeal, e.g., a sales-comparison approach to valuation must be considered and adequately investigated as part of any assessment process, a cost approach to valuation entails reproduction or replacement cost and not original cost less regulatory depreciation, rate base valuation cannot be considered, property financed by contribution in aid of construction was improperly exempted, and unit valuation is not allowed. The identification, cost, and appraisal of utility property in the fourteen assessing jurisdictions would be irrelevant to the preceding arguments.

However, a review of the prehearing statement submitted to the tribunal reveals, contrary to the findings of the MTT, that there was the additional argument that the multiplier tables would not produce an accurate reflection of the true cash value of T&D property. It is

clear that this argument was and is a major focus of the municipalities. The question thus appears to be whether the information requested from a mere fourteen assessing jurisdictions was relevant to that argument. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevant evidence is generally admissible, MRE 402, but may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. Further, in the context of discovery, one must consider whether the discovery request could be reasonably calculated to lead to the discovery of admissible (relevant) evidence. MCR 2.302(B)(1).

The utilities point out, and there does not appear to be any dispute, that there are over 1,700 tax assessing units in Michigan. The STC maintains:

> Without an examination and determination that these units are indeed a "cross-section" of assessing units in Michigan, even if Appellants were able to prove that appraisals of tangible personal property in these units indicated values different from that obtained through the use of the multipliers, the results would be meaningless. The multiplier tables may or may not produce completely accurate estimates of true cash value for utility property located within a particular unit of government in Michigan. But whether they do or not neither affirms nor denies the accuracy of the tables as a mass appraisal tool. In order to definitively establish whether the use of the multiplier tables result in an acceptable indicator of true cash value, it would be necessary to do a "state-wide" appraisal. Using data from only selected local units could result in skewed results.

One of the problems that we face here is that this appeal does not involve a dispute over an individualized assessment of particular property, where this Court or the MTT could state whether, in that situation, use of the tables accurately produced a property's true cash value. The tables, as mass appraisal tools, supposedly provide an approximation of value that is not ultimately controlling in a dispute; the true cash value governs and a party may obtain a deviation from the *Assessor's Manual* on the basis of a different theory of valuation that accurately and appropriately produces the true cash value. *Jones & Laughlin Steel Corp v City of Warren,* 193 Mich App 348, 353, 356; 483 NW2d 416 (1992). As made abundantly clear by our Supreme Court in *Danse Corp v Madison Hts,* 466 Mich 175, 181; 644 NW2d 721 (2002), the *Assessor's Manual* does not itself have the force of law. If the methods used are not inherently in violation of Michigan law, it is not proper for the MTT or this Court to rule, in a broad-sweeping ruling outside the context of an actual assessment dispute, that they are unlawful on the basis that the methods, and ultimately the tables, do not produce a true cash value. We could not correctly reach a conclusion on the issue of true cash value unless appraisals were undertaken and examined with respect to all T&D property and then compared with values obtained through use of the multiplier tables. This is not feasible and negates the purpose of a mass appraisal tool.

Our Supreme Court stated in *Meadowlanes, supra* at 485, that "[i]t is the Tax Tribunal's duty to determine which approaches are useful in providing the most accurate valuation *under the individual circumstances of each case.*" (Emphasis added.) In *Fisher-New Ctr Co v State Tax Comm,* 380 Mich 340, 369-370; 157 NW2d 271 (1968), rev'd on other grounds on reh 381 Mich 713; 167 NW2d 263 (1969), the Supreme Court stated:

We agree with the tax commission that a uniform approach to valuation does not always result in uniform assessment. While uniform approach may be desirable, it is not the ultimate goal of valuation. The ultimate goal is uniform true cash values. They are not necessarily achieved by a single uniform approach. . . . Consequently, there is no assurance that the use of a single uniform mode will achieve a uniform assessment. *Its use is not forbidden but such use should not foreclose other methods and approaches, depending upon the nature of the particular property, to achieve uniform assessment.* With all approaches available for use and comparison of results, valuations of property for assessment purposes are more likely to reflect true cash values than will be the case if only a single mode is used. [Citation omitted; emphasis added.]

We conclude that the determination of true cash value needs to be addressed and analyzed in an individual assessment dispute regarding particular property. Therefore, and in light of the nature of the proceedings before us, we decline to address whether use of the multiplier tables accurately produces or approximates true cash value, nor should the MTT have addressed the matter. The only appropriate issue to be addressed in the context of this case is whether the methods used by the STC are inherently in violation of Michigan law and could never be used in an assessment. Accordingly, the information sought through discovery by the municipalities was irrelevant, and the tribunal did not err in denying the motion to compel.

In regard to the municipalities' argument that the requested information was necessary in order to allow them to make the necessary adjustments for purposes of a proper sales-comparison approach in relation to out-of-state sales of utility property, this argument was never presented to the tribunal and is therefore waived. In any event, the argument does not form the basis for reversal for reasons stated below.

## C. SALES-COMPARISON APPROACH

The MTT opined that the municipalities did not prove that a sales-comparison approach could or should be used for T&D property valuation. The municipalities argue that before the STC finalized the multiplier tables, it was alerted of numerous sales of utility property that should have been investigated and utilized, pursuant to case law, in the process of formulating the tables. The municipalities maintain that, because the STC admittedly made no effort to obtain actual sales examples and did not have information on adjustable T&D property variables, i.e. age, size, condition, or location, for the combined gas and electric companies, it could not undertake a proper sales-comparison approach. Therefore, according to the municipalities, the STC did not conduct a serious investigation of the sales-comparison approach and violated the principles enunciated in *Meadowlanes, supra.*

We opine that this issue should be reviewed under two distinct lines of analysis. The first matter is whether Michigan law mandates that a sales-comparison approach be used in every instance where property is being assessed. Second, whether the STC should have further investigated and utilized a sales-comparison approach in constructing the multipliers, assuming that such an approach is not mandatory, in order to properly develop the tables.

### BASIC PRINCIPLES OF PROPERTY VALUATION AND THE SALES-COMPARISON APPROACH

Initially, it is important to review the basic principles of property valuation for purposes of ad valorem taxation in Michigan. As noted earlier, MCL 211.27 provides that " 'true cash value' means the usual selling price at

the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale." In *Jones, supra* at 353-356, this Court addressed the application of original cost multipliers found in the manual to the property at issue:

> The Tax Tribunal is under a duty to apply its expertise to the facts of a case to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances. True cash value is synonymous with fair market value. Regardless of the approach selected, the value determined must represent the usual price for which the subject property would sell. . . .

> \* \* \*

> . . . In this case, the tribunal did consider whether the in-use multiplier or the surplus multiplier should have been used in respondent's cost-less-depreciation assessment, but then simply accepted respondent's assessment without discussing why the assessment reflected the true cash value of the property. On remand, the tribunal shall make an independent determination of true cash value. We note that the tribunal is not bound to accept either of the parties' theories of valuation. It may accept one theory and reject the other, it may reject both theories, or it may utilize a combination of both in arriving at its determination. [Citations omitted.]

Our Supreme Court in *Meadowlanes, supra* at 484-486, addressed the various approaches utilized in property valuation:

> There are three traditional methods of determining true cash value, or fair market value, which have been found acceptable and reliable by the Tax Tribunal and the courts. They are: (1) the cost-less-depreciation approach, (2) the

sales-comparison or market approach, and (3) the capitalization-of-income approach. Variations of these approaches and entirely new methods may be useful if found to be accurate and reasonably related to the fair market value of the subject property. It is the Tax Tribunal's duty to determine which approaches are useful in providing the most accurate valuation under the individual circumstances of each case. Regardless of the valuation approach employed, the final value determination must represent the usual price for which the subject property would sell.

Under each approach, the appraiser analyzes data mathematically to determine an estimate of the fair market value . . . . All three approaches should be used whenever possible, and an appraisal which disregards an approach by mere statements and without research justifying nonuse is considered incomplete. The values derived under the various approaches are correlated, reconciled, and weighed in order to reach a final estimate of value. The ultimate goal of the valuation process is a well-supported conclusion that reflects the study of all factors that influence the market value of the subject property. [Citations omitted.]

"The sales-comparison approach indicates true cash value by analyzing recent sales of similar properties, comparing them with the subject property, and adjusting the sales price of the comparable properties to reflect differences between the two properties." *Id.* at 485 n 19. "[W]hen using a sales-comparison approach, the appraiser should adjust the sales price of comparables for differences in size, age, condition, location, and other value influences that buyers and sellers of real property take into account . . . ." *Id.* at 503. "An appraisal approach is to be disregarded only if there is research justifying its nonuse." *Id.* at 502.

It is clear that utilization of the sales-comparison approach is not mandatory. However, it is also clear that, minimally, a sales-comparison approach needs to be considered and used if feasible and justifiable.

EVIDENCE

The municipalities presented evidence showing that the STC was alerted, before the tables were formally adopted, about a number of sales of utility property across the United States. The STC was presented with a report prepared by R.W. Beck, Inc., that summarized the sale of thirty electric T&D plants from 1986 through 1999. The data indicated the name of the seller and buyer, the date of the sale, the asset(s) involved, the sales price, the net book value (OCLD—original cost less depreciation), and the ratio of sales price to OCLD or net book value. When collectively looking at the sales, the ratio mean was 1.75 and the median was 1.89, or in other words, the sales price reflected a price 1.75 times the net book value of the property (mean) or 1.89 the net book value (median). The STC was also presented with a report prepared by the municipalities' expert George Sansoucy containing information regarding forty-six sales. Table 1 of the report contained basic sales information on the sales of portions of electric systems, and table 2 referred to sales of entire electric systems. These sales took place between 1981 and 1994. Sansoucy concluded in the report:

> Table 3 extracts and summarizes these indicators [sale price per customer, sale price as a multiple of gross income, ratio of sale price to net book plant being sold] from the system sales shown in Table 2. Tables 1 and 2 clearly indicated that net book value is the least reliable indicator of market value, whether for system components, or the systems themselves. The broad range of sales prices, expressed as a multiple of net book value (ranging from .98 to 40.78 times net book) compels the conclusion that factors other than net book value and rate base are driving these sales. Table 3 is intended to illustrate that the variability between those sales is significantly reduced when they are analyzed by reference to gross income and sales price per

customer or by the sales price to gross income ratio. The compelling conclusion is that, in spite of the variability which Table 3 demonstrates, the fair market value of public utility electric transmission and distribution personal property is at significant multiples of regulatory asset (net book) value. It follows that the regulated income approach to valuation cannot be used, since there are buyers for such property ready, willing and able to pay substantially more than net book value.

Sansoucy testified at trial, referencing exhibit P-356,[8] how he believed one would go about qualifying a sale from the raw data. Sansoucy's analysis was made in the context of looking at three sales of gas distribution systems and two sales of electric distribution and transmission systems. The information contained in Sansoucy's report, exhibit P-356, concerning the sales is much more detailed than the information regarding the sales found in the reports submitted to the STC, although some of the sales are referenced in both of Sansoucy's reports. Sansoucy gathered the information and prepared the report to show that one could use sales information to formulate an indicator for use in the multiplier tables. Sansoucy went into significant detail indicating how adjustments would be made to allow use for comparison purposes.

The municipalities argue that the STC did nothing but briefly look at the reports on the multiple sales and discounted them with little consideration and little investigation regarding whether they could be used to develop a sales-comparison approach in constructing the tables. Indeed, the testimony by Eric Newberg, Utility Section Manager for the Michigan Department of Treasury, Tax Division, reflected that little time was

---

[8] Exhibit P-356 is a report prepared by Sansoucy for the municipalities in preparation for the litigation and not a report provided to the STC before it adopted the multiplier tables.

spent considering a sales approach. Newberg testified that he did not present questions to Sansoucy or R.W. Beck, Inc., after receiving their respective sales reports, and he did not seek additional information.

Newberg opined at trial that sales of regulated utility property were not good indicators of the value of that property because the sales amounts are often affected by property other than the operating system property. Newberg was unaware of any experts, besides Sansoucy, who advocated a sales-comparison approach to value utility property. Robert VanderMark, Equalization Director for Oakland County, testified that he could not identify one STC table or any table adopted in any other state that used all three approaches to value. Sansoucy admitted on cross-examination that transactions of utility companies are very complex, usually involving stock and rarely involving pure cash; generally a merger is involved. Cash is usually involved in the mix to some degree according to Sansoucy, but very rarely is the transaction solely a cash transaction. Sansoucy testified that when looking at the sales of other utility property, one would first qualify the sale and then subsequently make adjustments to use that sale to derive a value for a subject property. Sansoucy stated that his first report did not contain information qualifying the sales; however, exhibit P-356 did qualify a few of the sales; none of the reports explained precisely how to adjust the sale for purposes of reaching a valuation through the sales-comparison approach.

The evidence presented at trial regarding the sales-comparison approach was complicated and conflicting. We must remember that our review of the MTT's factual findings is to determine whether there was competent, material, and substantial evidence on the record supporting the tribunal's findings. *Meadowlanes, supra* at

482. The MTT ruled as follows regarding the municipalities' argument concerning the sales-comparison approach:

> Petitioners did not prove a sales comparison approach should, or even could, have been used as a reliable indicator of value for the Michigan T&D property involved here. They never took a single allegedly comparable sale and adjusted it to arrive at a value indicator useful for constructing a mass appraisal tool for T&D tangible personal property. No allegedly comparable sale involved only T&D tangible personal property. Significantly, Petitioners admitted that adjustments to such alleged comparables are inherently subjective and speculative. Sansoucy also admitted that even in 1997, the sales comparison approach was rarely used to value public utility property. He claimed a sales comparison approach should be done, but did not perform one.
>
> Petitioners' witness, Evanko,[9] conceded that there are many intangible assets owned by utility companies—including some types of contracts, customer lists, and a work force in place—the value of which cannot legally be attributed to T&D property. Newberg agreed with Sansoucy that there were circumstances under which use of the sales comparison approach was not proper because of the substantial adjustments required and the level of confidence the appraiser had in the adjustments.
>
> Newberg's and Hilpert's[10] judgment that the admittedly subjective adjustments required could not be made in a manner that would allow them to have confidence in the result is more credible than Sansoucy's unsupported claim to the contrary. It is not an error of law not to do a sales comparison approach, which, on the record in this case, is apparently infrequently, if ever, done; particularly given Petitioners' failure to demonstrate that it could be done in

---

[9] Gary Evanko is the Director of the Assessment and Equalization Division of the Department of Management and Budget for Wayne County.

[10] Mark Hilpert is the STC Chairman.

this case and given the two value conclusions based on methods routinely used by appraisers of public utility properties.

CONCLUSION

The case law, as indicated above, does not require use of the sales-comparison approach, but, minimally, it needs to be considered and its nonuse justified after research. The MTT's focus was on the municipalities' failure to prove that a sales-comparison approach should have and could have been utilized. We believe that focus is somewhat misdirected, in that *Meadowlanes* suggests that the market approach, or any of the three traditional approaches, should be delved into, and the record indicates that the STC disregarded the sales information provided to it in a rather flippant manner in the belief that a market approach was not feasible. The STC did so without further inquiry into the sales information provided to it. In other words, there was no real attempt by the STC to calculate the numbers, qualify property, and make adjustments in order to reflect an honest attempt to use a market approach. That being said, the evidence and testimony produced at the trial reflected, minimally, competent, material, and substantial evidence indicating that a market or sales-comparison approach would be overly subjective, with too many variables, and too many problems in making the necessary adjustments to be worthy of consideration. The testimony also indicated that these inherent problems were self-evident, thus making an extensive investigation by the STC unnecessary. The evidence showed that there are substantial obstacles in looking at numerous sales across the country and then attempting to qualify and compare those sales not to a particular piece of property, but to all Michigan T&D utility property for purposes of constructing mass ap-

praisal tools. Sansoucy even acknowledged that the use of a sales-comparison approach in valuing utility property is in its infancy. On this issue, we therefore conclude that there is no basis to reverse the MTT's ruling.

Moreover, because this case involves the validity of mass appraisal tools, and not a specific assessment dispute regarding particular property, we cannot help but question whether a sales-comparison approach would ever be feasible. *Meadowlanes,* and the principles espoused therein, did not pertain to the validity of mass appraisal tools, but rather to the assessment of a housing complex. With respect to a particular asset, a sales-comparison approach may well be workable because the necessary adjustments and qualifications could realistically be computed, as opposed to considering virtually all Michigan T&D utility property and attempting to make a comparison with numerous utility sales. Importantly, we are not precluding a party from using a sales-comparison approach for valuing T&D property in any future individual assessment dispute regarding particular T&D property. Finally, we reject the municipalities' argument concerning discovery and the sales-comparison approach. In light of our discussion above, we conclude that the information requested through discovery would not have a bearing on our ruling regarding the sales-comparison approach; therefore, the MTT did not abuse its discretion in denying the motion to compel discovery.

### D. TRADITIONAL REPRODUCTION OR REPLACEMENT COST APPROACH VERSUS OCLD OR NET BOOK VALUE

The municipalities assert that the cost-less-depreciation approach to valuation determines true cash value of property by deducting the loss in value

from deterioration and obsolescence from the current replacement or reproduction cost. The municipalities correctly maintain that the STC's cost approach did not use current replacement or reproduction cost, but rather used the net book value of the T&D property or OCLD. Additionally, OCLD reflects only costs allowed by the MPSC and regulatory depreciation. The municipalities further argue that net book value or OCLD does not equal fair market or true cash value, and that MCL 211.27(1) forbids the use of OCLD to be the controlling value for ad valorem tax assessment purposes. This is because OCLD equates to "rate base." Therefore, according to the municipalities, the STC's cost approach violates subsection 27(1).

"Under the cost approach, true cash value is derived by adding the estimated land value to an estimate of the current cost of reproducing or replacing improvements and then deducting the loss in value from depreciation in structures, i.e., physical deterioration and functional or economic obsolescence." *Meadowlanes, supra* at 484 n 18.

In *Meijer, Inc v Midland,* 240 Mich App 1, 4 n 5; 610 NW2d 242 (2000), this Court, discussing the cost approach to valuation, stated:

> In assessing value under the cost approach, an assessor begins with the cost to construct new and then deducts depreciation. The appraiser may begin with either reproduction cost, which is the cost of producing an exact duplicate of the property, or the replacement cost, which is the cost of replacing the utility provided by the subject property using a modern design that would be preferred by a typical user of the property. Replacement structures usually cost less than reproduction structures. *The Appraisal of Real Estate* (11th ed), p 371. The difference between reproduction cost and replacement cost is referred to as "excess construction cost" and is one type of func-

tional obsolescence. This Court has recognized that the use of the replacement cost approach eliminates some but not necessarily all forms of functional obsolescence that may exist. [Citation omitted.]

With respect to the municipalities' argument that reproduction cost, as opposed to historical or original cost, should be used under the cost approach to valuation, the MTT ruled:

> The evidence produced at trial establishes that utility valuation experts routinely use a historical cost less depreciation (net book value) cost approach when valuing a regulated utility property. Both Chapman and Newberg, who were the Staff utility valuation experts when the multiplier study was conducted, testified that it is widely accepted to use a net book value cost approach in valuing regulated public utilities. Sansoucy also indicated that a historical cost less depreciation approach should be considered in establishing value for a regulated utility. A number of states use a historical cost less depreciation approach when establishing values for regulated utilities. . . .
>
> Contrary to Petitioners' assertions, it is clear that the use of historical cost less depreciation to value regulated public utilities is a well-recognized, acceptable and appropriate methodology. Its use cannot be deemed to be either an error of law or the adoption of a wrong principle.

The municipalities correctly point out that the cost approach to valuation, as discussed in the case law, uses the property's replacement or reproduction cost less depreciation as opposed to the property's historical or original cost and regulatory depreciation as used by the STC under its cost-approach analysis. However, in and of itself, this does not render the STC's cost approach invalid because "variations of [the traditional] approaches and entirely new methods may be useful if found to be accurate and reasonably related to the fair market value of the subject property." *Meadowlanes, supra* at 485. Indeed, there was substantial and exten-

sive evidence showing that OCLD[11] is often used across the country to value utility property. The question for us, however, is whether there is anything inherently violative of Michigan law about using OCLD, so that it can never be used. Consistent with our earlier discussion of the discovery issue, whether use of OCLD accurately produces a property's true cash value is not a proper issue for this Court in light of the nature of these proceedings; that determination has to be made in the context of an individual assessment dispute.

The municipalities argue that the STC's cost approach, using OCLD, violates MCL 211.27(1) because it uses "rate base" in valuing utility property. There is case law that could be interpreted as precluding the use of the OCLD cost approach to valuation. *Consumers Power Co v Port Sheldon Twp,* 91 Mich App 180; 283 NW2d 680 (1979); *Consumers Power Co v Big Prairie Twp,* 81 Mich App 120; 265 NW2d 182 (1978). We now turn to a discussion of rate base, subsection 27(1), and the case law cited above.

### E. RATE BASE, MCL 211.27(1), AND CASE LAW

The municipalities argue that MCL 211.27(1) prohibits the value attributed to utility property for ratemaking purposes to be controlling evidence of true cash value for assessment purposes. According to the municipalities, the STC used the terms "rate base," "net book," and "contribution to rate base" interchangeably under their cost approach to valuation. The municipalities maintain that the STC's cost approach is controlled solely by the calculation of rate base; therefore, MCL 211.27 was violated.

---

[11] Also referred to as historical cost less depreciation (HCLD).

NET BOOK VALUE OR OCLD VERSUS RATE
BASE—INTRODUCTION AND EVIDENCE

MCL 211.27(1) provides, in relevant part, that

[a] sale or other disposition by this state or an agency or
political subdivision of this state of land acquired for
delinquent taxes or an appraisal made in connection with
the sale or other disposition *or the value attributed to the
property of regulated public utilities by a governmental
regulatory agency for rate-making purposes is not control-
ling evidence of true cash value for assessment purposes.*
[Emphasis added.]

The MTT ruled:

It also should be noted that witnesses for both parties in
this case agreed on several important points regarding this
language and its import in this case:

(1) "the value attributed to the property of regulated
public utilities by a governmental regulatory agency for
rate-making purposes" refers to rate base;

(2) rate base is not the same as net book cost;

(3) in valuing T&D property, the STC and Staff did not use
rate base; and

(4) the STC's concluded values exceed rate base.
[Transcript references omitted.]

The tribunal ruled that nothing contained in MCL
211.27(1) prohibited the STC from considering rate base
as evidence of true cash value, and that the statute
merely prohibits the use of the value attributed to the
property by the MPSC as controlling evidence of true
cash value. The MTT found that the municipalities
incorrectly read subsection 27(1) as prohibiting any
*consideration* of rate base. According to the tribunal,
such a reading is contrary to the clear, unambiguous
language of the statute. The tribunal further stated

that "[n]ot only did the STC not use rate base—let alone use it as 'controlling' evidence of value—but Staff investigated and then *explicitly rejected* rate base as a surrogate for value." (Emphasis in original.) The MTT indicated that even if net book value was the equivalent of rate base for purposes of the statute, it still could be considered in determining true cash value.

There is no dispute that net book value equates to OCLD. The question becomes whether net book value or OCLD equates to rate base used by the MPSC, and whether there has been a violation of subsection 27(1). As found by the MTT, there was evidence presented showing that there is in fact a difference between rate base and net book value.

There was testimony indicating that the value attributed to a regulated utility's property by a regulatory agency, the MPSC, for ratemaking purposes is called "rate base," and that rate base is the dollar amount calculated by the MPSC at a given point in time.

The following testimony was given regarding the differences between rate base and net book value or OCLD. Philip Munck, an associate of George Sansoucy, testified:

> Rate base is not—is not something that's found in the annual report [for utilities]. Rate base really is construction. It's a—it's a number that is created in the process of conducting a rate case. Once the rate case is completed and the rates have been established, the rate base has really no further meaning or application.
>
> It's common to refer to a group of assets and accounts as rate base within the industry because it does have some meaning. But strictly speaking rate base is only created for the purposes of determining rates. And once that process is completed, it has no further meaning until the next time it needs to be constructed for a rate case.

Chairman Hilpert testified:

*Q.*   Mr. Hilpert, is there a term that describes the value attributed to property of regulated public utilities by a governmental agency for rate-making purposes?

*A.*   Yes.

*Q.*   And what is that term?

*A.*   Rate base.

*Q.*   Does rate base change daily, or is it fixed as of a given point in time?

*A.*   I understand it to be fixed.

*Q.*   When rate base is established, does the net book value of property as of a point in time directly affect that conclusion?

*A.*   Yes.

*Q.*   On cross-examination . . . , you testified that net book value is to some degree the value attributed to property for rate-making purposes, What did you mean by that?

*A.*   I—I meant that at the time of a rate-making case, the net book value of the plant in service is used as one of the components of rate base.

*Q.*   And is that the net book value that changes each day, or is that net book value as of a given point in time?

*A.*   It is the net book value of that particular point in time.

George Sansoucy himself testified:

*Q.*   Good. And tell us why they're not the same [rate base and net book value]. Go ahead. Tell us all day about that one. Tell us why they're not the same.

*A.*   There's a whole host of things related to regulatory or to rate base. The most—one of the larger items is that net book value is a component of rate base used to calculate the recovery of and on the tangible property and the physical assets.

There [are] deductions for deferred income taxes, for example, that are deducted before rate base is calculated. There are additions for amortization, regulatory assets, et cetera. So that rate base has the book value essentially embedded in it but then there are a whole host of other additions and deletions related to rate base.

*Q.* Okay. Now, so it's an undisputable fact we can all agree that net book value and rate base are not the same thing?

*A.* Correct, than other possibly a coincidence.

## Newberg also testified:

*Q.* Now, is the original cost less depreciation cost approach, does it result in a value which can be equated to rate base?

*A.* Equated to rate base? No.

*Q.* They're not the same?

*A.* No.

*Q.* How are they different?

*A.* Rate base is determined at a specific point in time. Usually at a conclusion of a rate base case, the decision would be rate base at that point. So it's a specific point in time.

*Q.* Does rate base have considerations other than just original cost less depreciation ?

*A.* Yes.

*Q.* What might that be?

*A.* Generally they would consider working capital.

*Q.* Okay. Now, was your cost approach conclusion as of 12/31/97 the same as the utilities' rate base on 12/31/97?

*A.* No.

*Q.*  Okay. Now, what information did you have and did you review to develop your cost approach?

*A.*  We had information provided by the AUS study in the AUS study.

*Q.*  Did you also have information submitted through the utilities' various annual reports?

*A.*  Yes.

*Q.*  Did you investigate the accuracy of the cost approach performed on the AUS study?

*A.*  Yes, we did.

*Q.*  And did you determine whether or not that was an accurate determination of original cost less depreciation?

*A.*  We were able to estimate our own net book values independently and compare them to what AUS had come up with, and in total we were in agreement.

The documentary evidence presented to the MTT reveals that the last rate cases affecting the utilities at issue here occurred between 1993 and 1996; therefore, the last rate cases occurred long before the December 31, 1997, valuation date used by the STC. There was also evidence that some costs incurred by utilities in purchasing and owning T&D property are not allowed by the MPSC to be included in the utility's rate base because it would be inappropriate.

A review of the documentary evidence and testimony provides record support for the following factual conclusions:

1. The OCLD cost approach to utility property valuation is accepted by many experts in the field of property assessment as an accurate method, and it is used in numerous jurisdictions.

2. The value attributed to the property of regulated public utilities by a governmental regulatory agency for ratemaking purposes refers to rate base.

3. There was no evidence that any utility property was valued under the STC cost approach, pursuant to an actual rate base valuation, or as part of a rate base case, as determined by the MPSC. The municipalities' argument does not assert that a rate base calculation performed by the MPSC was actually used by the STC. Rather, the argument is that OCLD/net book value reflects the formula used in determining rate base and, therefore, it is just as offensive to MCL 211.27(1).

4. Rate base value is not the same as OCLD/net book value.

5. OCLD/net book value, however, is a major component of the formula used to undertake a rate base calculation.

6. The STC's reconciled values exceeded the OCLD/net book values.

7. Regulation affects the value of utility property.

We find that the MTT's consistent findings were thus supported by substantial, competent, and material evidence.

OCLD/NET BOOK VALUE VERSUS RATE BASE—CASE LAW

In *Big Prairie Twp, supra* at 123, Consumers Power Company, now known as Consumers Energy Company, challenged an assessment of the Hardy Dam, a hydroelectric generating station owned by Consumers. This Court rejected Consumers' argument that a depreciated net cost method should have been used to value the property. *Id.* at 132. The MTT upheld the taxing authority's decision to use an adjusted depreciated reconstruction cost. *Id.* at 126. The *Big Prairie* panel ruled:

This argument underlines the importance of Consumers' insistent suggestion that another public utility, contemplating purchasing the dam, would pay no more than Consumers' depreciated net cost because that is the basis on which the buyer would be allowed to earn a profit by the regulatory agencies involved. Much argument and evidence dealt with whether the PSC or FPC would permit a potential buyer to include more than depreciated net cost in its rate base if a higher sales price were agreed upon. It may be assumed that a regulated utility would probably not pay significantly more than depreciated net cost for Hardy Dam, since due to the effect of regulation a utility has little direct economic stake in reducing its expenses per electric unit sold, while it is vitally interested in having the highest possible capital base against which to apply its permitted profit margin. But aside from regulated public utilities, there are two categories of potential buyers for an electric generating facility: municipal power companies, whose rates are generally not regulated by either the PSC or FPC, and large industrial concerns with high electric power demands. To such a prospective buyer, depreciated net cost is irrelevant. What is relevant is remaining useful life and potential income or savings after expenses, and the maximum price such a buyer would pay for Hardy Dam can be better determined by the capitalization of income method. [*Id.* at 132-133.]

In *Port Sheldon, supra* at 182, Consumers challenged the MTT's decision to adopt the STC's appraisal of an electric generating plant. This Court concluded that, under the circumstances of the case, there was no error in utilizing an adjusted current reproduction cost method to value the property. *Id.* at 187. The *Port Sheldon* panel stated:

The plaintiff also argues that, if a cost approach is used to value the Campbell plant, the valuation must be based on the depreciated *original* cost of the plant, which is the basis on which Consumers Power must set its rates and thus earn its return, less the economic obsolescence . . . caused by rate regulation.

However, several considerations undermine plaintiff's argument. First, this Court has recognized a distinction between the value of property for rate-making purposes and *ad valorem* property tax purposes. *Consumers Power Co v Big Prairie Twp, supra,* at 137. Secondly, the Legislature recently amended MCL 211.27; MSA 7.27, to provide that: [statutory language quoted]. Although the statute took effect after the tax years in question, its express language indicates a legislative intent to reject assessments based on the depreciated original cost of public utility property, thus undermining plaintiff's basis for calculating economic obsolescence. Furthermore, while rate regulation may indeed contribute to economic obsolescence, a multitude of other factors, including management inefficiency, may create an earnings deficiency. Indeed, it appears that Consumers Power failed to earn for the tax years in question its authorized rate of return. To totally attribute an earnings shortfall to government regulation appears exaggerated. Finally, similar allocation problems appear to exist with this cost method as with the income approach, in light of the fact that rate-making is also done on a system-wide basis, and the economic obsolescence it presumably creates affects the total system's earnings. [*Port Sheldon, supra* at 187-188 (emphasis in original).]

Taking the factual conclusions noted earlier, and as supported by competent, material, and substantial evidence, we now consider them in the context of the above-cited case law and MCL 211.27(1), and render the following legal conclusions.

1. Language in MCL 211.27(1) that "the value attributed to the property of regulated public utilities by a governmental regulatory agency for rate-making purposes is not controlling evidence of true cash value for assessment purposes," suggests, as strictly read, that only a value actually determined in a rate base case by the MPSC cannot control. That was not the case here.

2. Assuming for now that there is no inherent illegality with the STC's income approach to valuation, and

assuming that OCLD/net book value equates to rate base as argued by the municipalities, the OCLD/net book value was not "controlling" for purposes of MCL 211.27(1) with regard to the STC's valuation because it was reconciled with the numbers developed under the income approach to valuation.

3. A strict reading of MCL 211.27(1) indicates that rate base can be taken into consideration, but it cannot be controlling. This is consistent with language in *Meadowlanes* that indicates that regulatory effect on value should be considered. The *Meadowlanes* Court stated:

> An overriding theme in the decisions addressing the ad valorem taxation of federally subsidized real property is that the valuation process must consider both the positive and negative aspects of the regulatory agreement voluntarily entered into between the owner and the government. This comports with the well-established rule that all factors relevant to property value should be considered in the assessment process. [*Meadowlanes, supra* at 499-500.]

4. *Grand Prairie*, decided before the enactment of the relevant language found in MCL 211.27(1), rejected Consumers' attempt to use OCLD on the basis that some sales could be made to a nonregulated entity, thereby detracting from any relevance of the OCLD approach. *Grand Prairie* is distinguishable because it was decided before the statutory language at issue was enacted, which allows for consideration of rate base. Further, the *Grand Prairie* panel was reviewing the case in the context of determining whether the MTT erred in allowing the use of the traditional cost approach (reproduction or replacement); it did not rule that OCLD could never be used. Also, the case did not involve multiple approaches to valuation and mass appraisal tools, but rather Consumers' attempt to use a sole valuation approach. We further note that the case recognized that

OCLD was extremely relevant for determining the value of regulated property, assuming consideration of a potential sale to an entity that would be regulated.

5. *Port Sheldon* is more significant because this Court considered MCL 211.27(1), and the panel stated that "its express language indicates a legislative intent to reject assessments based on the depreciated original cost of public utility property . . . ." *Port Sheldon, supra* at 188. The *Port Sheldon* panel found, essentially, that an actual rate base determination by the MPSC was not necessary; rather, it was the rate-base formula, which evidently the Court believed equated to OCLD, that was also prohibited by the statute. If we determine that *Port Sheldon* should be considered and is controlling, it would negate, to a degree, the STC's position. However, *Port Sheldon* is contrary to the clear language of subsection 27(1). We are not bound to follow the case, because it was issued before November 1, 1990, if we find that it was wrongly decided. MCR 7.215(J)(1). Nevertheless, assuming that *Port Sheldon* forms the basis to rule that OCLD should not control, we have distinguishable facts, in that, here, there were multiple approaches to valuation. *Port Sheldon* did not hold that OCLD could not be considered because that issue did not need addressing in light of the fact that Consumers urged sole reliance on OCLD. To the extent that *Port Sheldon* runs contrary to the clear language of subsection 27(1) and our decision today, it is disavowed.

The next argument made by the municipalities is that the income approach to valuation used by the STC was also legally invalid.

### F. INCOME APPROACH TO VALUATION AND RATE BASE

"The income-capitalization approach measures the present value of the future benefits of property owner-

ship by estimating the property's income stream and its resale value (reversionary interests) and then developing a capitalization rate which is used to convert the estimated future benefits into a present lump-sum value." *Meadowlanes, supra* at 485 n 20.

Newberg testified extensively about the process utilized by the STC in determining the value of utility property under the income approach. After first indicating that the income approach used by the STC was commonly used in the valuation of regulated utility property, Newberg testified:

> *Q.* Now, in your income approach did you estimate an income stream?
>
> *A.* Yes, we did.
>
> *Q.* And how did you do that?
>
> *A.* What we did is look at historical information going back a period of about five years. We were able to, first of all, determine basically a net book value of plant. We were able to compare that with an income on an annual basis. And basically a ratio of the income to the net plant by each year will give you a return on net plant for that period of years. We looked at the individual indicators of return on net plant for the period of years, selected one that would be indicative of next year's net income, probable net income, from that analysis, and then projected that against the net plant in place as of 12/31/97. That's the basic outline.
>
> *Q.* Is that a recognized method of estimating net operating income?
>
> *A.* Yes.

                    *    *    *

> *Q.* Now, in regards to your capitalization rate, what did you use for a cap rate?

*A.* We used the cap rate that was—well, I could give you the actual numbers that we used.

*Q.* Well, just maybe perhaps generally explain. We'll get into the numbers later.

*A.* Yes. The cap rate was composed—was developed through a weighted average cost of capital method, which is similar to a ban of investment. We have an equity rate, or the equity component. We have a rate for the preferred stock, which is generally a small amount of the total capital structure. And then we have a rate for the debt, which is the third part of the capital structure.

\* \* \*

*Q.* All right. Now, what type of property does your income approach cover?

*A.* In the case that we're working with here, we're dealing with operating utility property. Electric T and D, gas T and D—or, gas distribution, I should say.

*Q.* Now, in your report for all the various properties that you valued, did you perform the same basic income approach for all the property that you were charged with developing tables for?

*A.* Yes, we did.

Newberg then went through the specifics related to the valuation of Detroit Edison as an example of the process, and he stated, in part:

[T]his is where we—what I considered our first step. This was to develop a total probable 1998 NOI, net operating income, for Edison, the total operating company, including all the functions, T and D generation, et cetera. The whole company. Following that we'll break out an income attributable to just the T and D.

[A]s I indicated earlier, we set up basically—well, it's actually six years of information, which we obtained from

the Public Service Commission annual reports. We start at the top of the page with plant in service amounts. This is total plant at cost. We bring in nuclear fuel, fuel stocks, materials and supplies, construction work in progress, for each of six years, total that amount. We can call that total plant in use.

This is basically what an out—a purchaser would be looking at when he or she acquired as of, say, 12/31/97. This is an operating company with what is required to continue the operation, continue generating the electricity.

Using the computations regarding projected income, total property or plant net book value, and net book value of T&D property, the following formula was used to attribute projected income specifically to a utility's T&D property:

$$\text{TOTAL PROJECTED INCOME} \times \text{(times)} \frac{\text{T\&D NET BOOK VALUE}}{\begin{array}{c}\text{TOTAL PROPERTY (PLANT)}\\ \text{NET BOOK VALUE}\end{array}}$$
$$= \text{T\&D PROJECTED INCOME (then capitalized)}$$

Our review of the record supports the following statement made by the utilities in their appellate brief, which is consistent with the preceding formula:

Historical income is, thus, related to future income. After projecting total utility income, [the STC] used the accepted formula to project the portion of that total that T&D table property would be reasonably forecasted to earn, based on the ratio of T&D property's net book cost to the net book cost of all utility property.

Essentially, a ratio or percentage is created as between T&D net book and the total plant or property net book, which is then multiplied against the total pro-

jected income, resulting in an amount of projected income specifically attributed to T&D property.

The municipalities' arguments concerning the STC's income approach can be distilled as follows: (1) "[t]he income stream used by the STC . . . was not based on an expected future income to be produced by T&D property"; (2) actual income from T&D property was ignored; (3) the net book ratio was used on the basis that the MPSC allows a rate of return on net book value when utility rates are being set and this improperly substitutes the MPSC's allowed rate of return for a property's actual contribution; (4) some property may have little or no net book value but nevertheless makes a significant contribution to income; and (5) the actual earnings or net operating income of particular T&D property is affected by multiple variables such as location, management, and weather, and the simplistic ratio used by the STC does not reflect these variables as can be seen with respect to Detroit Edison's Fermi II Nuclear Plant (discussed separately later in this opinion).

There was testimony presented to the MTT indicating that the T&D net book to total plant net book ratio is reasonable because regulated property earns in direct proportion to its net book cost. Newberg testified:

> *Q.* Is the use of net book cost a valid basis for estimating probable future net operating income for regulated utility property?
>
> *A.* Yes, it is.
>
> *Q.* Why?
>
> *A.* It's—it's proper because there is a relationship—constant relationship between the direct proportional relationship, I should say, between the income that the property will generate and its net book value as part of the whole net book value.

Chairman Hilpert testified:

> *Q.* Well, let me put the question this way: Do the tables address this value influence [location]?

> *A.* These tables are developed based on the income that is attributable to them, regardless of where they're located.

> *Q.* Can you tell us how that addresses the issue of location?

> *A.* Well,—

> *Q.* The value influence of location?

> *A.* Well, I think that the way these particular assets can earn money is limited by rate regulation. And that has a way of tempering any particular location. Locational influence, for example.

> *Q.* You're telling us that the regulations of the Michigan Public Service Commission temper the value influence of location? Is that what you're telling us?

> * * *

> *A.* Yes. Because regardless of where a particular line or pole is located, the income that that particular line or pole may generate is not going to be — is not going to vary much, if at all.

The record showed that, for purposes of ratemaking by the MPSC, net operating income is not computed, and that the rate of return allowed by the MPSC on utility property, as measured by the property's net book value, does not necessarily equate to the net operating income actually received by the utilities. It is clear from the record that the computation of net operating income utilized in the STC's income approach was based on actual income taken from annual reports for the utility companies.

What the municipalities are arguing, as we under-
stand it, is that simply because there is a specific allowed
rate of return on utility property, it does not necessarily
follow that income actually earned or generated by the
utility company as a whole can be apportioned to T&D
property merely on the basis of net book values and the
rate of return. For example, in an admittedly overly
simplistic illustration, if a utility had four assets of equal
net book value ($25) with a total net book value of $100,
and the utility was subject to an allowed rate of return of
ten percent or $10, and the company had net operating
income of $10, the STC's position would be that each of
those four assets earned $2.50. The municipalities main-
tain, in theory, that it is probable that, for example, three
of those assets may actually have earned all or most of
that $10 with the fourth asset generating no or little
actual income, for any variety of reasons such as weather
conditions, despite the fact that the asset that did not
generate any or little income had an allowed rate of
return of ten percent or $2.50. If this is the case,
according to the municipalities, using a ratio, as between
total plant net book and T&D net book, to allocate net
operating income to T&D property would skew the num-
bers and not accurately reflect actual income earned by
the T&D property.

Respondents mischaracterize the municipalities' ar-
gument as one maintaining that actual net operating
income was not considered in the STC's formulation
process; however, that is not what the municipalities
are arguing, and the record is clear that actual net
operating income for the previous five years was con-
sidered. Rather, the municipalities are arguing that you
cannot reasonably apply the total plant/T&D net-book-
value ratio to a projected net operating income, based
on five years of actual income, because there was a lack

of evidence that the T&D property actually earned or will earn according to that ratio.

The municipalities maintain that the STC should have determined the actual income derived specifically from T&D utility property in order to formulate projected net operating income, and that such a method would be the only way to properly utilize the income approach to valuation. Respondents counter by arguing that any other method would be unworkable for producing mass appraisal tools. The utilities claim that they know of no method for determining an income stream emanating from T&D assets because T&D property generates income from its use as part of an integrated system along with non-T&D property.

Although we believe that the municipalities' arguments have merit simply on an instinctive and common-sense level, it does not prove that the income approach used by the STC is inherently contrary to Michigan law, so that it could never be used. We find that the STC's income-approach method, while being questionable, is not in conflict with any known law. *Meadowlanes* itself indicates that the income approach involves estimations, and *Meadowlanes* did not involve the complicated issue of attributing an income stream to a portion of the overall property owned by a taxpayer. *Meadowlanes* does not disallow the application of a reasonable formula under such circumstances.[12] Moreover, the municipalities failed to present valid evidence to show how an income stream can be determined with respect to solely T&D property. The only argument made by the municipalities in their appellate brief provides:

The income stream used by the STC for its income

---

[12] Once again, whether a value produced through the STC's income approach will result in a property's true cash value requires examination on an individual basis regarding specific property.

approach analysis was not based on an expected future income to be produced by T&D property, notwithstanding the fact that such evidence is available. Respondent-Appellee's proposed Exhibit 222 contained the testimony of the director of pricing and regulatory affairs for Detroit Edison and established that if one wanted to allocate income to T&D property, it would equate to 2.2 cents per kilowatt hour.

The MTT did not allow admission of exhibit P-222 on relevancy grounds. The municipalities have not appealed this ruling; therefore, it is improper to argue that the excluded evidence should be considered by us. Even if the evidence were considered, it would not establish that the STC's income approach was legally invalid. The municipalities are essentially arguing that another income approach should have been used, but this is not the basis of their suit, which was an attack on the legitimacy of the STC's approach. Moreover, as indicated by respondents, the argument fails to reference any other evidence qualifying or quantifying the 2.2-cent rate to the extent that it could be shown that the rate related solely to T&D property.

The record suggests that there is no realistic manner to determine income actually and specifically generated by T&D property, and that the allocation process used by the STC is appropriate and reasonable because it relates to the rate of return on property and net book values, which are important factors bearing on a utility company's earning power.[13] The testimony presented to the MTT concluding that the T&D net book to total plant net book ratio or allocation is reasonable because regulated

---

[13] We are not precluding the use of an income approach to valuation, which takes into consideration actual income generated by T&D property, in an individualized assessment dispute regarding particular property should it be appropriate under the circumstances and supported by evidence.

property earns in direct proportion to its net book cost would appear to be a necessary, though somewhat illusory, principle. Moreover, it is reasonable to conclude that a potential purchaser would view utility property in a manner consistent with the STC's income approach in determining a purchase price because of the reality of governmental regulation. Minimally, we find no inherent illegality in using the allocation process. We cannot emphasize enough that the multiplier tables are mass appraisal tools, and individual aspects of particular property need to be addressed in a specific assessment dispute, not here.

We believe that a larger issue here is whether the use of net book value or OCLD in creating the ratio formula utilized in the income approach to valuation runs contrary to MCL 211.27(1). Although net book value or OCLD plays a role in the income approach, and assuming that OCLD can be equated to rate base under the statute, it cannot be said that the value attributed to the property under the income approach was rate base. Rather, past income was reviewed in determining prospective income followed by an allocation, arguably taking into consideration "rate base," whereby income was attributed to T&D property and then capitalized to produce a value. Therefore, rate base is simply not the controlling value. It is arguable that OCLD or net book value is so interspersed with rate base in computing the cost and income approaches used by the STC that it violates the intent of the Legislature in enacting MCL 211.27. There is no doubt that MPSC regulation affects the value of utility companies by controlling their rate of return, and there is little doubt that utility companies like Consumers, Detroit Edison, and others, are going to be with us for some time to come. In fact, BDO Seidman, a well-respected accounting firm, was of the opinion that rate base should form the basis for valuing

T&D utility property. We find, on the basis of the record and the law, that regulatory effect should be considered in determining the value of T&D utility property. But there is a line that cannot be crossed, i.e., MCL 211.27(1), and the exact point of demarcation set forth in the statute is not entirely clear. However, we conclude here that the STC did not cross that line.

### G. DETROIT EDISON'S FERMI II NUCLEAR PLANT

The municipalities refer to Fermi as an example how the T&D net book/total plant net book ratio is skewed and invalid. The municipalities argue that Fermi was shown to be an impaired asset; however, "its net book value was included in the total plant in service net book value when developing the ratio of T&D net book value to total plant in service net book value." The municipalities maintain that this distorts the income attributable to T&D property, and resulted in a calculation showing that Detroit Edison has only thirty-two percent of its income generated by T&D property, whereas Consumers Energy was calculated as receiving sixty-five percent of its income from T&D properties. Sansoucy testified:

*A.* Now, FERMI II is fundamentally an impaired asset.

*Q.* What is an impaired asset?

*A.* The asset is not performing financially in the manner for which it was anticipated to perform when it was purchased or placed in service. Namely, the financial performance, the money side of it. This is not necessarily the operational side of it, but the money side of it is not earning or recovering at what it was intended to be, so it is listed as or can be listed as impaired.

And in the simplest of terms, spent a bunch of money but not earning a bunch of money, we have a problem.

The municipalities' argument on this matter is that because Fermi was included in total plant or property net book value, it created a lower percentage with regard to the T&D net book to total plant net book ratio while ignoring the fact that Fermi was impaired and not generating much income. Thus, it is argued, the inclusion of Fermi in total plant net book improperly reduced the percentage to thirty-two percent, thereby allowing only a thirty-two percent allocation of prospective net operating income to T&D property, despite the fact that the income was generated by the T&D property at a higher percentage if you consider that the income did not come from Fermi at a rate proportionate to its net book value in light of its impaired status.

There was evidence presented that Fermi still generated income, as even acknowledged by Sansoucy, with Sansoucy merely adding that Fermi is "not going to recover the same as the gross book used in rate base." The tribunal ruled as follows regarding the Fermi matter:

> In summary, Petitioners have done nothing to refute Newberg's presentation of the immaterial effect on the ultimate value conclusion for T&D property caused by the fact that FERMI is not allowed to earn in the exact same direct proportion to its net book cost as are all other assets. As this was the only specific exception to the rule that all property earns in the same proportion to its net book cost that Petitioners even attempted to identify, their arguments attacking net book value as a value indicator fail.

This ruling is supported by the evidence. Newberg exhaustively and clearly testified that the slight difference between the percentage of income Fermi earned in proportion to its net book cost and that of all other assets was trivial, 0.87. The end result of Newberg's analysis was that there was no effective difference whether Fermi was included or excluded from the

analysis in computing values under the income approach to valuation. Newberg testified:

> *Q.* As a result of your analysis of FERMI, would you recommend any changes in the value conclusion of your electric T and D study?
>
> *A.* No, I would not.

The MTT's finding was supported by competent, material, and substantial evidence; there was no error.

### H. CONTRIBUTION IN AID OF CONSTRUCTION (CIAC)

Regarding CIAC, the MTT stated:

> The record is clear that CIAC is not property. CIAC is a financial contribution to offset total construction costs of a project. Hilpert agreed with Sansoucy that CIAC is an "upfront" payment from a third party to a utility that the utility thereafter spends, together with its own money, to construct T&D property. CIAC is required by the MPSC not to benefit the utility, but rather to protect existing utility ratepayers (i.e., other customers) from having their rates increased because new customers may require special, more-expensive-to-install property than that of the typical, existing ratepayers. For example, developers may wish to put in underground electrical service to make a development more attractive. Customers who have large lots might require longer utility lines that would be more costly to build than shorter lines to typical lots. These developers or customers with large lots may make a CIAC payment to reduce the net cost to the utility that would otherwise be passed on to other customers.
>
> As Hilpert explained, in Michigan electric and gas utilities only earn income on the portion of the property financed by their own funds, i.e., net book cost. Sansoucy agrees. No purchaser would pay more for Michigan T&D property if it includes property financed in part with CIAC. If there were two utilities with T&D property having identical net book values and expected income, and all other factors were the same

except that only one utility had property financed in part by CIAC, the T&D property of the utilities would have identical values. This is because CIAC does not affect net book cost, it does not help the utility or any purchaser of utility property earn more income than that supported by the net book cost of its property.

To prove the STC's treatment of CIAC constituted an error of law or adoption of wrong principles, Petitioners needed to show that these costs automatically increase value as a matter of law. Specifically, under the facts at issue here, Petitioners would have to prove that these expenditures made to install utility property, which do not increase the earnings base of the property, nevertheless automatically · increase the value of the property above the value established by the STC's Tables. But Petitioners have failed to submit any such evidence. [Emphasis deleted.]

The explanation given by the tribunal with respect to what CIAC is and how it is handled by the MPSC is supported by the evidence. Property obtained through CIAC is used in distributing and transmitting electricity. The record reflects that information on each utility company's CIAC is kept on file with the MPSC, and that the utilities' annual reports show that they have acquired ownership of millions of dollars of T&D property paid for by others through CIAC. The STC did not include property acquired or financed through CIAC in developing the tables.

The municipalities assert that the tribunal found, in essence, that property constructed through CIAC had zero value because the earning base, or rate base, is not increased because of this property. The municipalities argue:

The income produced by CIAC property was not accounted for by STC Staff because CIAC was left out of net book value when STC Staff computed the ratio of T&D net book value to total plant in service net book value. While it is inappropriate to impute income to T&D property beyond

that which it actually contributes to the company's overall earnings . . . , it is equally inappropriate to refuse to recognize the actual income attributable to CIAC property. Although a reasonable buyer would not pay more for the property than the actual income justifies, a reasonable buyer would be required to recognize the property's actual income. If a reasonable buyer believed that the way to impute income is by calculating a ratio of net book value of T&D to total plant in service net book value (an irrational concept), the reasonable buyer would, at the very least, be required to include the net book value of CIAC property in the equation before the ratio is computed.

The municipalities maintain that, because CIAC-financed property must generate income, the net book value of property obtained through CIAC should have been added to T&D net book value and total plant net book value as part of the STC's allocation formula under the income approach. The municipalities argue that the failure to consider CIAC-financed property results in a lower T&D net book to total property net book ratio or percentage, thus lowering the projected income attributable to T&D property.

Respondents' position is that, because property obtained through CIAC is not included in a utility's net book value, and because it therefore cannot generate a rate of return, no purchaser would pay more money for T&D property if it included property financed in part with CIAC. Moreover, respondents argue that if income is generated by CIAC-financed property, that income was considered by the STC in reviewing five years of net operating income.

We fully recognize and appreciate the point the municipalities are making, i.e., realistically, CIAC-financed property is generating income in some form or manner, and that the income was necessarily included in the utilities' net operating income, yet net book

values for CIAC-financed property was not considered. Because of regulation, however, the utilities are not allowed a rate of return on CIAC-financed property, so on the books that property does not and cannot generate any income, and any income actually generated by CIAC-financed property must be recaptured elsewhere. The evidence failed to show that one can look at individual components of a utility company and specify an amount of income as actually being generated by particular assets. Rather, the nature of the beast suggests that the only feasible way to look at income generation is by considering the assets or property in total. Because MCL 211.27 mandates that we consider what a willing buyer would pay for the property, and because of the nature of regulation and its effect on earnings, it is not unreasonable to conclude that a willing buyer is not going to pay any more for CIAC-financed property because one is not allowed a rate of return on the asset. We therefore conclude that the MTT properly ruled that the STC did not use a wrong principle or commit an error of law in excluding CIAC-financed property in its development of the tables.

### I. TESTING AND ENTRY ERRORS

#### OBJECTIVE TESTING

The municipalities assert that the development of the tables lacked objective testing, and that the STC should have tested the multipliers to see if they were a valid indicator of true cash value. The municipalities maintain:

> As an absolute minimum, it was incumbent on the STC to test the tables by applying them to the historic vintage costs of any one of the individual companies which were combined in the appraisal. This simple test would allow one

to see whether the proposed value for an individual company was within an acceptable range of the appraised value of that company.

The MTT ruled:

> They [municipalities] claim the STC should have appraised all (or some unspecified fraction) of the property subject to the Tables individually and then compared the appraised values to the values generated by the Tables, based upon the appraised company's original cost of property subject to the Tables. Apparently, Petitioners contend that the two values must fall within some unspecified percentage of each other, because they claim: "Such a test [individual appraisals of each company's property], had it been made, would reveal an unacceptable disparity between the proposed value and reconciled value."
>
> First, "such a test" is not appropriate. It would be impractical and defeat the very purpose of a mass appraisal tool if to "test" the tool, individual appraisals of all (or some large unspecified fraction) of the property must be performed. This is just a summation of individual appraisals. . . .
>
> * * *
>
> Hilpert . . . testified that the STC received no complaints from the Utilities claiming an adverse impact on them. All of the participating Utilities themselves submitted studies supporting one table based on their combined original cost data. It would be for the Utilities to complain of a disparate impact if the Tables overvalue some property of some companies and undervalue that of other companies. Not only have there been no such complaints, but the Utilities themselves proposed one table per industry for all companies.

We find the MTT's reasoning and logic sound. As reiterated throughout this opinion, this case involves the legality of mass appraisal tools, and the objective-testing argument presented by the municipalities nec-

essarily relates to the accuracy of the tables in producing a property's true cash value, but this issue needs to be addressed in individual assessment disputes and not in the context of a ruling on the inherent legality of the tables. It appears that the municipalities would not be satisfied until there was comparison testing of all utility company property. This simply is not a realistic approach for creating mass appraisal tools; there will be disparities when the STC's multipliers are used, but this is why they constitute guidelines. In an individual assessment dispute, if the municipality, or for that matter the utilities, do not think the multipliers equate to true cash value, they can introduce evidence to the contrary for consideration.

ENTRY ERRORS

The municipalities next argue that entry errors permeate the tables to the point of destruction of a numerically supported result. Regarding the claims of data entry errors, the MTT ruled:

> Data entry errors were made in the Staff's valuation study; however, at trial Respondent placed in evidence as Exhibits R-32 and R-33 the Staff valuation study recomputed with the data entry errors corrected. As corrected for data entry errors, the electric transmission and distribution study did not change the reconciled value conclusion reached by the Staff that was used by the STC to develop Table H for electric transmission and distribution property.
>
> Only one error affected the reconciled value for gas distribution property in the Staff's valuation study. In the Staff's income approach, the depreciation for Michigan Consolidated Gas Company was inadvertently substituted in the study for that applicable to Consumers Energy Company. As corrected for this error, the recomputed reconciled value for the gas distribution property is $200 million less than that originally determined by the Staff. As

corrected, the reconciled value ($1.6 billion) for the gas distribution property is less than the reconciled value ($1.8 billion) used by the STC in developing Table I for gas distribution property [the MTT remanded to the STC to make this correction].

The municipalities simply do not contest the tribunal's ruling regarding entry errors by citing specifics in their appellate brief on how there remained error. Therefore, there is no basis for reversal.

### J. UNIT VALUATION

The municipalities argue that the cost and income approaches used by the STC are founded on a unit valuation method in contravention of *Port Sheldon*.

Unit valuation was defined by Chairman Hilpert during his testimony before the MTT:

*Q.* I refer you now to the WSATA [Western States Association of Tax Administrators] manual, previously identified as Petitioner's Exhibit P-190, and quote for a moment from Page 8 . . .[.] That page indicates that unit appraisal means valuing an integrated group of assets functioning as an economic unit as one thing without reference to the independent value of the component parts. And do you agree with that definition of unit valuation?

*A.* Yes, I do.

*Q.* When you value a whole as a whole, does it include the contributing value of its parts?

*A.* Yes.

*Q.* Can you give us an example?

*A.* I—I think the example was used earlier about a house that straddles a particular jurisdiction line. I—or I guess—I guess just a house, has a roof and a floor and a—and walls, furnace, et cetera. All of them contribute to the value of the house as a whole.

*Q.* And how would that be valued using a unit approach?

*A.* It would be valued based on how the house would —the usual selling price of the house as a whole.

The WSATA manual, which was admitted as an exhibit at trial, more fully explained the nature of unit valuation:

> Closely akin to market value is the use of the unit appraisal concept. Unit appraisal means valuing an integrated group of assets functioning as an economic unit as "one thing," without reference to the independent value of the component parts. The logic of this concept is that informed buyers and sellers will most likely buy or sell a viable operating unit as "one thing." Centrally assessed properties are usually thoroughly integrated in operation and construction. The value of a length of copper wire in an electric-system lies not in the fact that copper has a market value as scrap metal but that the wire is a part of a thoroughly complete and integrated electric system. An item in the complex array of many property items practically defies individual or segregated valuation. Segments of the total property can be valued by allocation or apportionment of the total unit value when required for statutory reasons. As a general rule, however, no attempt is made to assign values in a unit appraisal to individual items of property unless it is a legal requirement. Standing apart, individual items of property possess some type of liquidation value; arranged together as an economic unit, the total property complex has a value usually greater than the sum of many liquidation values for individual items.

There is no dispute amongst the parties that the STC utilized a unit valuation or appraisal method in developing the multiplier tables by looking at nearly all T&D property in Michigan as a whole or a unit in the context of the cost and income approaches to valuation. The disagreement is whether that is permissible under Michigan law. The MTT concluded that property that

functions as an integrated whole may be valued as a unit. The tribunal added that the municipalities failed to submit evidence of values of individual assets such as wires, pipes, poles, and transformers severed from the overall operating system. Additionally, the MTT noted that the municipalities failed to show that the values of individual assets, when considered in the aggregate, would result in a higher value than the values established through use of the multiplier tables. The tribunal agreed with the STC that, with regard to utility property, the whole is worth more than the sum of the component parts with the highest and best use of the property being part of an integrated system.

We rule, consistently with the remainder of this opinion, that the only issue for us to consider in the context of the unit valuation argument is whether unit valuation is inherently violative of Michigan law under the circumstances presented. The municipalities rely exclusively on this Court's decision in *Port Sheldon, supra.* In *Port Sheldon,* Consumers' expert "considered two methods to arrive at the true cash value of the Campbell facility—a unit valuation, in which earnings of the entire system are first capitalized, and then a portion of those capitalized earnings is allocated to the power plant as its value; and a cost approach . . . ." *Port Sheldon, supra* at 182. The STC adopted a valuation method using the current reproduction cost of the Campbell plant less depreciation, which resulted in substantially higher appraisals. *Id.* The MTT agreed with the STC's method, and indicated "its concern with the practical problems of fairly and uniformly allocating an accurate portion of the capitalized earnings among the various power plants in the Consumers Power system . . . ." *Id.* at 183.

On appeal, Consumers contended, in part, that a unit valuation based on capitalized earnings of the entire system achieved the best approximation of the plant's value. *Id.* at 184-185. Consumers maintained that, "because an individual power plant has little value apart from its contribution to the system's output expressed in terms of earnings, a plant's value for property tax purposes should be synonymous with the portion of the system's total earnings allocable to it." *Id.* at 185. According to Consumers' method, "this value is derived by applying an allocation multiplier, based on the original cost in the individual plant divided by the original cost of the entire system, to the system's capitalized earnings." *Id.*

The *Port Sheldon* panel ruled:

> We recognize that a company may be valued as a "unit", based on its capitalized earnings. This income approach to property valuation has been approved by the Michigan Supreme Court, *CAF Investment Co v State Tax Comm* [392 Mich 442, 450; 221 NW2d 588 (1974)]. Defendant's appraisal expert also testified that he normally considered income, among other indicators of value, when appraising utilities such as telephone companies and railroads, and admitted that little difference in valuation theory appeared between these utilities and a state-wide electric company. He further stated, in connection with the above utilities, that reasonable allocation factors may be developed to separate out the Michigan value for those doing business interstate. Plaintiff thus contends that the same approach may equally be employed in valuing a power generating system.
>
> In Michigan, however, the unit method is used to value only those public utility properties which by statute must be centrally assessed. These include telephone, telegraph and rail companies assessed by the State Board of Assessors. MCL 207.4; MSA 7.254. Mineral properties are likewise centrally assessed by the State Geologist. MCL 211.24; MSA 7.24. These central assessment provisions do not

include power generating public utilities, which thus remain under local assessment. MCL 211.3, 211.10; MSA 7.3, 7.10. In addition to authorizing central assessment by one assessing authority, the Legislature has also established uniform guidelines and allocation techniques applicable to all properties assessed under the above provisions. MCL 207.9, 207.275; MSA 7.259, 13.158(5).

By contrast, no statutory authority exists to permit local assessing officers to assess property located outside their individual districts, nor is there a state-wide uniform method to allocate income from a power-generating system to an individual plant.

Given the present property tax structure and the risk of arbitrariness in the allocation of a power system's value among its various components, we are unable to conclude that the Michigan Tax Tribunal adopted wrong principles in declining to apply the unit valuation method in assessing plaintiff's property. [*Port Sheldon, supra* at 185-186.]

Here, there is no dispute that the utility companies are not and cannot be assessed centrally by the state under MCL 207.4. Additionally, there is no dispute that local assessment is used to value utility property, albeit with guidance from the multiplier tables that were derived by use of unit valuation or appraisal.

*Port Sheldon* is distinguishable and does not stand for the proposition that unit valuation cannot be utilized when constructing mass appraisal tools for purposes of use in the *Assessor's Manual* for property that is not centrally assessed. *Port Sheldon* involved a specific assessment dispute over particular property, not an attempt to implement mass appraisal tools, i.e., the multiplier tables. The *Port Sheldon* panel stated that its position was supported by the fact that there was no authority permitting local assessors to assess property outside their districts, nor a statewide uniform method to allocate income from a power-generating system to

an individual plant. Here, the multiplier tables were developed by the STC under its statutory mandate to prepare the *Assessor's Manual* for statewide use; therefore, local assessors are not being asked to assess property outside their jurisdiction. As such, the concerns raised in *Port Sheldon* do not exist here.

To the extent that *Port Sheldon* can be read to prohibit the valuation methodologies used in the case at bar, it is disavowed. MCR 7.215(J)(1). We note that the *Port Sheldon* panel's statement that the "unit method is used to value only those public utility properties which by statute must be centrally assessed" lacks citation of authority. *Port Sheldon, supra* at 186. The panel simply makes the leap, on its own, that only centrally assessed property can be valued pursuant to the unit method. *Id.* There are no statutory or constitutional provisions that prohibit unit valuation, and any method for determining true cash value that is recognized as accurate and reasonably related to fair market value will satisfy the statutory prescription and is an acceptable indicator of true cash value. *Meadowlanes, supra* at 485. The multiplier tables are not inherently unlawful simply because they utilize a unit approach to valuation.

Moreover, *Great Lakes Div of Nat'l Steel Corp v Ecorse,* 227 Mich App 379; 576 NW2d 667 (1998), supports the position that unit valuation can be used in Michigan for property that is not centrally assessed.

In *Great Lakes,* the petitioner operated an integrated steel mill with steel-making and ancillary facilities located partly in the city of Ecorse and partly in the city of River Rouge in Wayne County. *Id.* at 385. The arguments of the parties with respect to valuation, and the MTT's ruling were as follows:

None of the parties ultimately relied on an income approach in arriving at an indicated value for the integrated steel mill. GLD's [steel mill] valuation gave weight to a comparable-sales or market approach. GLD valued the integrated steel mill as a whole, and then allocated that value between the cities for each tax year. The valuations of Ecorse and River Rouge gave weight to cost-less-depreciation approaches for each tax year. Ecorse and River Rouge did not value the entire integrated steel mill, but instead arrived at valuations based on the appraisal of facilities located within their respective cities.

\* \* \*

With regard to the integrated steel mill, the Tax Tribunal determined that a rationale existed for rejecting all proposed valuation methods, but that it could use GLD's proofs regarding comparable sales to develop a formula for measuring the value of the integrated steel mill as a whole. . . . The Tax Tribunal then allocated this value between the cities and to specific tax parcels within each city. [*Id.* at 387.]

This Court ruled that the MTT's overall approach was reasonable under the particular circumstances of the case. *Id.* at 420. This case supports use of a unit valuation method to ascertain a property's true cash value. The tribunal here did not commit error.

### K. *WAYNE CO*

The municipalities argue that this Court, in *Wayne Co, supra,* held that the multiplier tables were adopted as a guide rather than a rule under the APA and, therefore, did not have the force of law. According to the municipalities, the *Wayne Co* opinion stands for the proposition that assessors do not have to follow the tables. The municipalities argue that the MTT violated this principle when it stated that local assessing officials may not depart from the STC multiplier tables

unless they prove that another valuation method is more accurate; the MTT ruling is thus inconsistent with case law.

The municipalities' argument lacks merit. The municipalities cite solely the language on page 63 of the MTT's opinion and judgment in support of its position without quoting specific language. On pages 62-63, the tribunal states, in relevant part:

> By its plain language, section 10e requires a local assessing official to use the official *Assessor's Manual* or a manual approved by the STC with their latest supplements as a guide in preparing assessments. Tables H and I are part of the official *Assessor's Manual*; and thus, must be used as a guide in preparing assessments of T&D property. A local assessing official has no authority to adopt and apply *as a mass appraisal tool* a multiplier table other than the latest tables included in the official *Assessor's Manual* or other manual approved by the STC. A local assessing official may depart from applying Tables H and I *only* in respect of a specific tax parcel and then *only* if other recognized and applicable valuation methods (for example: a market value appraisal) yield a more accurate indication of true cash (market) value of the specific tax parcel. [Emphasis in original; citations omitted (the MTT then goes on to directly quote language from *Wayne Co*).]

We see nothing inconsistent with the ruling by the MTT and the decision of this Court in *Wayne Co*. The *Wayne Co* panel did not rule that the *Assessor's Manual* could be ignored and was obsolete. Admittedly, some confusion could arise where MCL 211.10e mandates use of the manual, yet the tables found therein do not have the force of law and are merely guides. On a practical level, and consistent with documentation sent by the STC to local assessors, an assessor would use, as a starting point, the multiplier tables in valuing particular property and then make whatever adjustments are necessary because of some unique feature of the prop-

erty or unique circumstance. The assessor would in fact be using the *Assessor's Manual* as a reference or starting point, i.e., a guide, thus satisfying MCL 211.10e, and then making a valuation modification if necessary based on the circumstances in order to satisfy the constitutional and statutory mandate that property be valued at its true cash value. Alternatively, the assessor may find that use of the multiplier tables contained in the manual accurately yields a property's true cash value without any modification being necessary, or the assessor can simply apply the tables because there is no known information to the contrary or that makes it improper to use the tables. Of course, in that situation the assessing jurisdiction or the property owner can dispute the finding all the way to the MTT on the basis of evidence that conflicts with the value determined by the assessor. The tribunal's ruling is consistent with these observations and the case law. There was no error.

### V. CONCLUSION

We hold that, pursuant to the Michigan Constitution of 1963, art 6, § 28, the MTT did not commit errors of law or adopt wrong principles, except with respect to the tribunal's conclusion that its review of the STC's multiplier tables was governed by Const 1963, art 6, § 28, and that the tables were to be afforded a presumption of correctness. This error, however, does not compel reversal because no prejudice was suffered by the municipalities in light of the substance of the MTT's ultimate ruling in the case. Additionally, in entering a judgment in favor of the STC and the utilities, the tribunal's factual findings were supported by competent, material, and substantial evidence. The municipalities failed to show that

the methods used in constructing the multiplier tables
are inherently violative of Michigan law.

   Affirmed.